Good morning, may it please the Court. I'm Neil Greenstein here on behalf of Nissan Computer Corporation, one of the defendants and appellants in the case. Mr. Joseph Hurst is here on behalf of the Internet Center, and I will be presenting my arguments for approximately ten minutes. Mr. Hurst will represent the Internet Center for approximately seven, and I would like to reserve three minutes for rebuttal. I'm sure that the Court has reviewed the facts in this case. I would like to point out a couple of very significant items. This case involves an individual, Mr. Uzi Nissan, who immigrated here from Israel in 1976. He started businesses in 1980. All of these businesses bore his surname. When he turned around and he adopted the Nissan.com domain name in 1994, he did so in good faith. That was so found by Judge Pragerson, it is not on appeal in this Court. In contrast here, Nissan Motor Corporation, what they did is they realized that their Internet structure, that their whole marketing was a mess, that they were trying to fix their problems, and they tried to seize upon an opportunity to act like the thousand-pound gorilla to try to take the domain name away from Mr. Nissan. The real major and critical issue here, first and foremost, I believe, is what is the date when fame was acquired. Under the anti-dilution statute, as the Court, I'm sure, is well aware, Nissan Motor can only prevent Mr. Nissan and Nissan Computer Corporation from using the Nissan mark if the use of the Nissan.com domain name and the use of Nissan by Mr. Nissan commenced after the acquisition of fame by Nissan Motor Company, assuming that the mark has even acquired fame on this date. So the time period here I submit to this Court is 1980. In 1980, Mr. Nissan first adopted his surname in connection with his motor vehicle repair business. In 1987, he later adopted the Nissan International name in connection with his business of exporting heavy equipment and computers. In 1991, he then adopted Nissan Computer Corporation as part of the series of companies that he had, and that was in the computer business. If, in fact, which I submit is the case, that 1980 is the appropriate date, there is no issue of disputed fact here. Nissan Motor Company did not even start using the Nissan name on vehicles until the mid-1980s. They did obtain a trademark registration at an earlier date. It was based upon a treaty where they had a registration in another country, and based upon the treaty rights they obtained at the registration in the U.S., they did show some nominative or token use in order to preserve that registration. But even below in the trial court, in order to establish in any way that there was some kind of use at an early date, they had to resort to finding a book which made a reference to a movie which referenced the Ranger vehicle. If I understand it correctly, it was Mr. Nissan who used his own name in the 1980s, and it was Nissan Computer which began to use that name in 1991. That's correct, Your Honor. Why doesn't that make a difference, and why shouldn't the calculation start from the time when Nissan Computer began to use that name? For several reasons, Your Honor. Mr. Nissan is a 100 percent shareholder of Nissan Computer Corporation. He is also the licensor of the Nissan mark to Nissan Computer Corporation. Under the 1946 Lanham Act, as opposed to going back to previous trademark acts, there is a recognition of licensing. We are not in the old days of Coca-Cola where it was not permitted to license trademarks in Coca-Cola as a way around the non-licensing provision. It turned around and sold syrup that was pre-made and said, okay, you can mix this with the fizzy water, but we can't give you the formula or we can't give you some other kind of mix in order to do that. So what we have here is a situation where Mr. Nissan has licensed the mark to Nissan Computer Corporation. Nissan Computer Corporation steps into the shoes of Mr. Nissan for that purpose. So if in 1991 Mr. Nissan had formed Nissan Auto Company of the East Coast and licensed his name to that, would your same argument apply? If he had formed in 1991 an automobile company on the East Coast, there would be an issue there not so much on the dilution standpoint but on the trademark infringement aspect. But at least at this part, as to this part of your argument, you're saying he was, if we accept that he was free to even license it to something called Nissan Motor, form a company if he could have, if, and therefore we would measure it still by 1980. Well, Your Honor, I'm not suggesting that he could turn around and license that in a way that would otherwise be unlawful. I'm just talking about this part of your argument. I mean, obviously there would be other considerations. I'd suggest that the example of what is more important here from the licensing standpoint is, let's take, for example, the term United. And if we assume that that is, has acquired fame with respect to United Airlines, does that mean that United Van Lines, who clearly has used that term for a long time, clearly is coexisting. United Van Lines has a licensee in Pasadena. And it has a falling out with the licensee. Maybe the licensee has a financial problem. That licensee goes away. Under the proposal that 1991 be the date in which you not allow a licensing, that means that United Van Lines could not turn around and license another user here in Pasadena for United Van Lines, or that licensee would then be subject to, would be subject to being shut down by United Airlines on the basis of dilution. I would submit that that would wreak havoc in the corporate world. A similar example, which would also be, I think, quite untenable, is in many corporate transactions. When there is an acquisition of a company, there is an acquisition of assets rather than an acquisition of stock. Does that mean that when there is an acquisition of assets that for dilution purposes, all of a sudden the clock is starting over again? I think it would be a very dangerous path to suggest that the rights of the licensor, vis-à-vis the Dilution Act, do not inure to the benefit of the licensee. Is there further, have I answered the court's question on? Yes, I understand your position. Would the court like me to address if 1991 is the critical date? From a factual standpoint here, even if 1991, and again, I submit that 1980 is the appropriate date, but from a factual standpoint, even if 1991 were the critical time period here, there are a number of disputes, factual disputes below, which would make it so that the summary judgment ruling here would simply not be sustainable. If we take a look at the fact that Nissan Motor only started using the mark on vehicles in approximately 1985, we're talking about a very short time period for it to have acquired this famousness that it claims to have acquired. And we must look at that date, if that is the critical date, the 1991 date, as to what the fame was then. We don't look at what the fame is today in order to determine whether Mr. Nissan and Nissan Computer can continue using the mark. There were a number of disputes with respect to the surveys. Now, on the surveys there were certainly a number of contradictions. There was an expert that Nissan Computer had, which certainly disputed, I think it very substantially disputed, the validity, the credibility, and the conclusions of some of the surveys that were submitted by the plaintiff. I want to follow your train of thought. Even if we start from 1991, what are the facts that have to be decided at trial? That's what I heard you say. Is that right? If 1991 is the date, then what are they? Okay. Start it. The time period of the fame from 1985 to 1991, the surveys have to be weighed by the jury. The money spent on advertising, while there is a substantial amount of money that was spent on advertising put in the record by Nissan Motor, the question ultimately isn't just did they spend the money, but what was the effect of that advertising? Did it go to advertise the brand, Nissan, or was it just moving metal and going after particular models and advertising a model like the Z, Z28 model? In fact, there is evidence in the record suggesting that much of the advertising money that was spent was spent moving metal, was spent on the particular model and not on the Nissan brand per se. In 1989, Nissan Motor's own study commissioned by Chiat Day, their advertising agency, concluded that model activity does not automatically rub off on make perception. They also concluded, again in 1989, that the Nissan brand was declining in a stable manner. In February 1989, there was an unaided awareness test which showed that it fell below 30%. There was also a six-party agreement which was in existence at that time, and this six-party agreement was an agreement among six different entities, all agreeing to use and to co-exist, not licensing among one another, but agreed to co-exist in the marketplace. This includes Nissan Chemical, Nissan Fire and Marine Insurance, and some of the names on the agreement were predecessor companies, but it encompasses these. Which in fact sells thermoses, not under the Nissan thermos name, but under the Nissan name, stainless thermoses, so it has the generic term stainless with it, which can be purchased in Northern California. We have Pete's Coffee, I think they've started to come down here as well. They can be purchased in your local coffee shop. So that is certainly a factor under the dilution law. There were literally well over 100, I believe it was about 190 third-party users of the Nissan mark, several of which we did take depositions of, including Nissan Antiques, Nissan Jewelers. There was a Nissan pool company, I believe, or spa company that was selling some chemicals for spas. So there's a number of issues here that we have, a number of factual disputes. Not to interrupt your rendition of that, but if the district court, assuming for the sake of argument, the district court was correct that 1994 was the proper date, do you contend that those factual issues flow through to 1994, or is there a different analysis? Your Honor, I believe these factual issues go through to that, as well as we were not given the opportunity at the lower court when the judge changed his mind to go from 1991 to 1994 to submit additional evidence. So clearly the evidence that we did submit below was focused on 1991. And in your view, when you add up all these factors, what conclusion do they compel? It compels to me, and I believe it will compel to the jury, that the mark was not famous, the Nissan motor mark was not famous in 1991, and that is the critical date if this court so determines that it's 1991 rather than 1980. And if it was not famous in 1991, if this court should determine that that is the critical date, then Mr. Nissan and Nissan Computer Corporation are entitled to continue using the Nissan mark, notwithstanding the dilution statute, because it falls within this first use, or what I would refer to as the grandfathering provision under that act. Just so there's no confusion, I think you answered a slightly different question from the one that Judge Trott asked. What it really compels for our purposes, in your view, I assume, is a determination that there's a triable issue of fact. I'm sorry, Your Honor. Yes. If, in fact, 1991 is the date, then we would be looking at a triable issue of fact. If, in fact, 1980 is the date, then I believe this court can simply reverse. I believe this court can reverse on the grounds of latches as well. I notice that my time is up. Let me ask you one more question, a brief one. Do you think that the determination of the date is a question of law or fact? I'm sorry, determination? The determination of the appropriate date is one of law or fact under this record. I believe it is a determination of law, because what we need to look at here in looking at that date is, from the standpoint of the use that was done by Nissan, Mr. Nissan, in 1980, under the dilution statute, you don't look at what the goods and services are. That's the whole point of the dilution statute. So you shouldn't need to look at some kind of concept like you would have under the trademark laws, such as attacking or anything like that, if, in fact, Mr. Nissan used it in connection, in a commercial way, in connection with goods and services in 1980, which is undisputed. Then that should be the appropriate date for purposes of the critical date, not 1991. I understand your argument. It was just a short answer I needed, not a repetition of your arguments. Thank you. Thank you, Counsel. Good morning, Your Honors. Joseph Hirsch for the Internet Center. I'll be covering issues specific to the Internet Center and also the First Amendment issue, which I think is common to both defendants. Before I turn to those issues, however, I did want to address a question that Judge Smith had regarding whether or not Uzi Nissan were to start the Uzi Automotive in 1991 and avoid copyright infringement. Who's Judge Smith? I'm sorry. I didn't mean Judge Thomas. I'm sorry, Your Honor. Smith and Thomas are common names. He's not Nissan. Smith and Thomas. In any event, I think that the question goes to the very important distinction in this case between infringement liability and dilution liability. Dilution liability lies if you are using the mark on unrelated goods. And if Uzi Nissan had started using the mark on automobiles in 1991, he would not be entitled to the previous use, to any presumption from his previous use, because he was not using it on related goods. Whereas in dilution, you don't have to show related goods. So if he was licensing the mark, his surname, from 1980 onward, he was using the mark in commerce as the FTDA requires, and the FTDA's grandfathering provision should apply. I don't think that there's any clash between trademark infringement and trademark dilution in that respect. With regard to my client, the Internet Center, I'd like to touch quickly on the finding of dilution with regard to the Internet Center. Dilution is intended to prevent a consumer from associating in its mind a famous trademark with some good other than a good produced by the trademark holder. And I believe that the finding of liability on my client loses sight of that fundamental reason for trademark dilution liability. Because the liability is based upon, this all happened after the entry of the preliminary injunction where Judge Pregerson said Nissan.com must have a prominent disclaimer. So you go to Nissan.com, you see a prominent disclaimer that says, this site is not associated with Nissan Motors. Underneath it, it says Nissan Motors lawsuit against us. You click there, you go to another site called ncchelp.org. There are a number of tabs up above. One of them says, how can you help? You click there. There are a number of options underneath, one of which is express your financial support or words like that. You click there. You get taken to another page that has advertising on it. And on one part of it, it says, click here for an auto quote. So at each one of those steps, the notion that a consumer is going to, who is being informed over and over again that this has nothing to do with Nissan Motor, is going to associate the Nissan trademark with some advertising he sees four clicks later. It's ludicrous. There is no reasonable way that you could say that a consumer associates in his mind a trademark with another site when you are four or five clicks away from the trademark, each click of which tells you that you're not dealing with the trademark anymore. With regard to the alter ego finding, I only want to say quite quickly that this is, I think, a standard of review issue. The inferences have to be drawn in my client's favor. And the court says, well, Mr. Nissan, these two corporations occasionally shared employees, occasionally shared office space, and they made documented loans back and forth. Even if that presents some slim ground on which a jury could find that there was alter ego status with regard to ignoring corporate form, there is no way that you can find, as a matter of law, that they engaged in fraudulent transactions. And that's the other prong of the test. And construing the evidence in the light most favorable to my client, I don't think you even have to engage in much construing. There is no evidence of fraud. I think this all boils down to Judge Pregerson being offended by the content that he saw at ncchelp.org, i.e., the criticisms that he saw at ncchelp.org. And that brings me quickly to the First Amendment issue. All of the cases on which the court relied have one thing in common. Well, several things in common. One, they all involved trademark confusion, i.e., these were sites in which someone used the identical trademark and attempted to confuse people into following the links on that site. And they'd be led to, say, propaganda against the Jews for Jesus or anti-abortion stuff on the Planned Parenthood site. And they all predated the Anti-Cybersquad and Consumer Protection Act. Since the passage of the Anti-Cybersquad Act, we have got, I was doing a rough count this morning, at least eight cases, all of which are cited in the briefs, and I won't go through them in the list, saying that domain names that are identical or nearly identical to the trademark holder are not, if they don't have commercial content on them, they do not involve trademark delusion. Judge Pregerson's reasoning with regard to why this is a commercial use of the site, it just doesn't make sense because his reasoning is if you put links to material critical of Nissan Motor on the Nissan.com site, then it becomes a commercial use. Sufficiently commercial. Sufficiently commercial. Well, of course, that sufficiently commercial is not the test that this court outlined in the Mattel case. The Mattel case is it has to be solely commercial. If it has, and he says sufficiently commercial, well, if that's true, then links to sites that praise Nissan or links to sites that merely review Nissan products would also do that, and they are not prohibited. It is clearly a content-based prohibition. And in any event. His distinguishing factor seems to be, however, unlike Ford Motor and Bally, the instant case presents a situation in which the mark itself is also the domain name. The goodwill that Nissan Motor has built up in the Nissan mark ensures a steady stream of visitors expecting to find Nissan Motor at Nissan.com and Nissan.net, critical commentary, et cetera. He says that's the difference. Under these circumstances, the critical speech becomes commercial. Right. And the difference, of course, the one I think most salient fact that he did not mention is that anyone who visited that site when these links were there, the first thing they saw was a disclaimer that said this doesn't belong to Nissan Motor. Nissan Motor's web address is X. Nissan Driven USA, I think, is what it is. May I clarify something? The appeal goes only to the fifth paragraph of the injunction? With regard to the First Amendment issue. Yes. Yes. With regard to the posting of links. It doesn't go to the third paragraph. Which is non-commercial. Which is posting disparaging remarks at Nissan.com and Nissan.net. I understand your appeal to go only to the links, which is paragraph 5. I would not concede that, Your Honor. I think that the How am I going to tell? Because everywhere in the papers it refers to paragraph 5 and to the links. Because I think that the links present the clearest infringement on Mr. Nissan's First Amendment rights. But I don't believe that content on the site that is accompanied by a disclaimer particularly if it is accompanied by a disclaimer would be permissible under the First Amendment Act. And the cases out of the Fifth and Sixth Circuits, the TMI case, which is out of the Sixth Circuit, they were using the trademark was Trendmaker Home. They were using TrendmakerHomes.com. In the CPI International case, it was Skippy, as in Skippy Peanut Butter. They were using Skippy.com. These are cited? Yes, ma'am. So I think that, yes, there were cases long ago. No, I shouldn't say long ago. But prior to the passage of the anti-cybersquatting statute that went on infringement issues. And those cases involved domain names that were clearly infringing. And the sites under domain names and the sites were clearly infringing. There was consumer confusion. And I don't think you can say that there was consumer confusion. Well, if I understand it correctly, the preliminary injunction is based entirely on the Dilution Act. Yes. Yes. The permanent injunction, yes. Yes. Based on anything else. Right. And that's why I'm saying that the cases of the court relied on that. We understand that. Okay. I mean, we know what it's not, which is all you're saying. Right. The problem is whether it comports with the First Amendment or doesn't. Right. Right. But I think that there is case law saying that trademark infringement comports with the First Amendment much more comfortably, to use Judge Kuczynski's phrase, it comports much more comfortably with trademark infringement than it does with trademark dilution. He said that in the Mattel case. I don't want to use any of Mr. Weinstein's time. All right. Thank you, counsel. We'll hear from the other side. May it please the Court, Julian Poon and Wayne Barsky of Gibson, Dun & Kretcher. We represent Nissan Motor, the owner of the famous, federally registered, and incontestable Nissan marque, and its subsidiary, Nissan North America, the exclusive licensee of that marque. The reason we're here is whether it's famous or not. Yes, Your Honor. I'd like to begin with a question that Judge Thomas asked of my counsel on the other side, is the determination of the date of fame a question of law or one of fact? And I would agree that it is a question of law, so no remand is necessary for a trial on this issue. That's because 1994 was the first time that the single word Nissan marque was being used by someone. What difference does that make under a dilution statute? Because the whole point of dilution is the use of the name, regardless of whether it's in a competitive environment or not. Yes, that's correct, Judge Rimer. So, I mean, the name was first used, putting aside Mr. Nissan's use of the name for the moment. All right. The name was clearly first used when Nissan Computer Corporation used the name Nissan Computer. That, I'm not sure I would agree with that, Your Honor. It was a different use. Well, how come you don't? Well, but the kind of use is immaterial on dilution, isn't it? No, Your Honor. It's the overall commercial impression that the marque makes on a dilution. I see. So Kodak Pianos is okay, I mean, is a dilution, but Nissan Computer is not. Kodak Pianos may be, depending on whether it's just Kodak, the single word marque, on the piano itself or if it's Kodak Pianos as the composite marque. Despite the numerous times that we and everybody else is referred to, including Congress, is referred to the example of Kodak Pianos. Your view is that isn't dilutive, whereas Kodak, but it has to be just Kodak? Your Honor, if I may first, I think the premise is that the Supreme Court referred to Kodak Pianos just as Kodak, the single marque, Pianos. It wasn't Kodak Pianos in capital marques, and the Supreme Court was quoted in the legislative history that the legislative history also referred to just Kodak, the single word marque, on a piano, or DuPont, the single word marque, on shoes. Or the other example, I forget, but it was, again, a single word marque, a famous marque, on a product. That said, it's a factual question, I would think, whether it's sufficiently identical or nearly identical within the meaning of this Court's test and feign for it to trigger FTDA liability. But that's a separate question from whether it is such use for purposes of the FTDA's grandfathering provision. I think what NCC is trying to do here is grandfather in its earlier use of Nissan Computer Corporation in 1991 and say, okay, we've been using that since 1991. You can't then say that we've been, that we've diluted the fame of your marque in 1994. But it's the particular use that the plaintiff seeks to enjoin, which is referred to in the grandfathering provision of the FTDA.  And I don't think that would exactly be a principled basis upon which to make a decision, because that puts the entire outcome in the hands of the person who holds the assertively senior marque. You can just sit around and wait until you decide you want to write a lawsuit and then say, aha, it's that use that I'm worried about, not prior use. With all due respect, I disagree. It wouldn't be, because if Your Honor's thinking of the TNN case or the other. Kagan in any case, I'm thinking about a principled way to make a decision about what the use of it is. And the principled basis would be if the same marque is being, if the same marque is being used the same way before, it's not the case that an FTDA plaintiff can rest on its laurels and wait until, and wait until the particular use in the specific medium that the plaintiff has a problem with arises. In other words, to take an example, if the FTDA defendant had been using the single word marque TNN since 1989, let's say, and they didn't start using it as a domain name until 1994, it's not the case that the FTDA plaintiff can step in and say as of 94, aha, let's start evaluating the fame of the marque as of that date. You're diluting the marque as of that date. You have to look back to 1989 when the defendant was using the same marque in the same way. And that's not what we have here with Nissan Computer Corporation, which creates a different commercial impression on the average reasonable consumer than with the single word Nissan marque by itself. It connotes something very different. It tells you this is for computers in a way that Nissan by itself doesn't. And there aren't any examples in the legislative history or in the Supreme Court's decision in Moseley where they are talking about a famous marque being lodged in with a composite marque and saying that that is such use. It's not necessarily the same thing. So if we accept your argument, why isn't that a factual question as to whether it's 1994 or 1991? The more you talk, the more I seem to think it's factual. I don't think there's a factual issue as to the date. I think it's a factual issue because you say there is no genuine issue of material facts. So as a matter of law, we can adopt it. 1994, that's the first. It's indisputable. That's the first time that the Nissan marque was used by itself by the defendants in this case in the legally equivalent Internet domain name Nissan.com or Nissan.net. There are no earlier uses of the single word Nissan marque by itself. So there's no genuine issue of material fact, even if it is a question of fact. That's it. That's the answer. Because there was no such – are you referring to the such use grandfathering provision of the FTDA? Your Honor, I don't think that provision is triggered because the particular complaint of use that the plaintiff is seeking to enjoin with the understanding that if that same use had been used before, that sets off the grandfathering provision trigger. If your such use argument doesn't work, do you have another one? Or is that what it turns on? No, it doesn't. It also turns on the marque being different itself. Nissan Computer Corporation, that competent marque, creating a different overall impression on the average consumer than does Nissan itself. This court has previously held in Brookfield Communications that movie buff is different from the movie buff's movie store, or that alpha is different from alpha steel or alpha steel tube. And to take another example, I mean, would Ford Models Inc., Ford Modeling Agency, would that necessarily dilute Ford, the motor company's famous marque in the Ford marque? I don't think so. But if you're talking about similarity, I mean, I understand everybody's legal argument as to what you're tying 80 or 91 or 94, at least I think I do. But if you get to the question of similarity, then don't you get into a factual question of whether the use of 1991 was similar in the marque or not? Do you just think the facts are undisputed? Is that what it is? I think the facts are undisputed, and this court could set 1994 as a matter of law as the relevant date for determining fame. But even if this court were to look back to 1991, which I submit is the earliest date that this court should look back to determining fame, still there's no triable issue of fact for a reasonable fact finder as to the famousness of the Nissan marque. Still, as of 1991, all the evidence that the — From 1985 to 91, we spent nearly a billion dollars advertising our marque, winning Advertising Age Magazine's TV Commercial of the Year Award from 1988. After six weeks of consecutive advertising on Monday Night Football, we sold half a million vehicles from 85 to 91 exclusively under the Nissan marque. Allison Fisher surveys that the district court relied on demonstrated 55 percent consumer awareness of the Nissan marque in 1985, 60 percent by 86, 65 percent by 87, 70 percent by 92, justifying the district court's conclusion as a matter of undisputed fact that the Nissan marque enjoyed high consumer recognition and fame as of — at least as early as the late 80s. You heard the other side tick off all the evidence to the contrary. The money spent was really on brand, you know, Zs and things like that. They had nothing to do with Nissan. The surveys, your own study in 1989, what does all that amount to? Yes, Judge Trott, I was going to go down that list, the 1989 studies. So the Nissan marque, assume, argue, wonder, it was declining in a stable manner. So what? I mean, it could have been declining from a very high level. It doesn't tell you how far it declined to. That was just one factor in combination with all the others. Sure, and I'll march through the rest of the factors, Your Honor. The effect of the advertising. Again, we've demonstrated the results of that, and I don't think the evidence shows that this was just moving metal. It was just particular brands. Some of these ads that they were referring to, the name is Nissan. And the Road to Rio campaign that we won our Advertising Age Award on in 1988, I think, that was also based on just the Nissan marque. The unaided awareness test that they referred to saying it was less than 30 percent. That was just based on a survey of what TV commercial or what commercial do you recall seeing within the past week. I mean, that's not really indicative of anything. Maybe just that week we weren't running ads. Well, if it's true, what does 30 percent mean? I mean, would you say that's famous in and of itself? What's the percentage threshold? I understand your factual attack on it, but, I mean, 30 percent is fairly significant, I'd say. But I don't think that 30 percent figure is probative of very much. I'm just saying, assuming if it is probative, is 30 percent enough to create a famous marque or at least pass the threshold? In combination with other factories suggesting fame, it may very well. I don't think that figure matters very much. All these other third-party uses that NCC referred to, none of them are the Nissan marque by itself. The six-party agreement that NCC referred to, only one of those entities uses the Nissan marque by itself, and that's Nissan Motor and Nissan North America. The Nissan Stainless, as NCC has referred to, that's, again, a composite use of the marque. It's not Nissan by itself. Could you explain to me again why this is not exactly the same as Kodak Pianos? Yes, Your Honor. Because it's, why Nissan Computer Corporation is not the same as Kodak Pianos, is that the question? I mean, Kodak Pianos, both words, caps, if that's the case, then what I would say is that Kodak Pianos by itself is a different use than is just Kodak by itself on the piano. Everybody, here's the problem I've got. I mean, the dilution statute is a very different animal from trademark infringement. Yes. And it's meant to apply to only really a handful of marques which have really, really become extremely household wordish. Yes. Like Kodak. Right. So the theory is, well, Kodak has become such a household word that if you attach something ridiculous to it, everybody knows that Kodak has absolutely nothing to do with pianos. But if you say Kodak Pianos, that's dilutive because Kodak is just so powerful. You can't use it, period, in combination or singly. I have no idea what Kodak's name is, to tell you the truth. Just Kodak. Like Nissan. It's just Nissan. But you can't say Kodak Pianos, so why are you saying that you can say Nissan Computer? Your Honor, my – our position doesn't rise or fall on whether you can or cannot say Nissan Computer Corporation without running afoul of the dilution statute. Well, if that's true, then isn't that the time, the use of the word Nissan Computer, from which the date has to be measured? No, because it's – that's – that's not such use. It doesn't trigger the grandfathering provision as of that date. But even if 1991 were the correct date to measure the famousness of the Nissan mark, still I don't think there's a genuine issue of material fact for a reasonable fact finder to try. There's no reason to send this case back for trial. It's clear on the undisputed evidence in this record. I am – I can't remember, I'm sorry, which one it was, but I remember Judge Pregerson resolving a challenge to one of the surveys. But I didn't see any resolution with respect to the others. So have we got to just assume that there – these surveys are pristine and as a matter of law are admissible and take everything in on faith, even though there were counter-expert declarations? No, Your Honor. But what this Court need not do is simply take generalized and nonspecific allegations of faults in the survey. There's been extensive briefing in this case based on 20 volumes of excerpts of record, and I have yet to see any specific examples of what's wrong with these survey questions. To give you just one example of one of the survey questions, one of the survey questions was now, suppose you entered the Internet address www.nissan.com or www.nissan.net. What individual, product, brand, or company do you think you would find? Now, I'm not sure what's wrong with that survey. When was that question asked? Pardon me? When was the question asked? That question was asked to determine whether – that question was asked in 2000 as part of the survey. Well, so what does that have to show with respect to an earlier time period, 9 years before? Well, it shows blurring as of now. But as to an earlier time period, I'm not aware of any specific faults within the survey. You want us to accept as a matter of law that that doesn't create a triable issue of fact as to what the famousness of the mark in 1991 was, or 1994, for that matter? I'm not aware of any problems with any of these surveys that would rise to the level of a genuine issue of material fact for a reasonable fact finder. I understand that, as with all surveys, there may always be disputes about, oh, was the sample size large enough? Were the questions asked exactly the right way? Were the statistics run the right way? But at the end of the day, weighing all this, is there really a genuine issue of triable fact for the reasonable fact finder? And I submit there isn't any. All there are are just generalized, vague allegations of problems with these surveys without any specific examples. So they have size. Okay. Well, I've just given you a specific one. Can you explain to me the logical inference that you draw from a 2,000 question saying, what do you think when you think of www.nissan.com and extrapolate back to what the answer would have been in 1991? No, Your Honor. There was never an attempt, and I'm sorry if I used that survey question as an example to extrapolate back from 2,000. Well, it's not a super good one. I think you'll have to agree. Yes, Judge Reimer, but I cite that example because I'm not familiar with any other survey questions from 94 and 91 that have problems with them that rise to such a level that we'd have to send this back for a trial. Okay. I don't think there's really any dispute that pre-1991 uses, or there's any real question as to whether pre-1991 uses of Nissan are relevant or not. The NCC wasn't even in existence until 1991, and the fact that Mr. Uzi Nissan may have used his name as part of concatenation of different names, Nissan Foreign Car Mobile Repair Service or Nissan International, prior to 1991 is not relevant. There's been no authority cited to suggest that the licensee can claim the benefit of or try and tack on to the licensor's prior use of the mark, especially in wholly unrelated industries, import-export business or a foreign car repair service as compared to a computer corporation. And also the fact that NCC pointed out that there would be an issue as to Nissan auto sales as a hypothetical in 1991. I think if that's the case, that defeats their argument that pre-1991 uses are relevant because if they were relevant, they would have established priority of use. So there shouldn't be an issue as to Nissan auto sales if NCC is correct that the date that should matter is the 1980 date use of fame. Do you want to talk about the injunction at all? Certainly, Your Honor. I think the injunction as it stands is fine as I understand it. Only paragraph 5 of the injunction is really an issue. It has been contested. So the rest of the injunction, if there are objections to that, that's waived. If there are any First Amendment concerns that the injunction gives rise to, I don't think so for the reasons that we've already briefed. But basically, it's because there are adequate alternative avenues of communication and because the way to think about the injunction is it's really a restriction on the non-expressive use of the domain names as source identifiers and ancillary restrictions connected with that to prevent the dilution or the infringement of the mark. We have maintained on cross-appeal that the injunction should be broadened to, if there are First Amendment problems, with the fact that it restricts disparaging commentary about Nissan on sites linked to Nissan.com, Nissan.net, that can easily be remedied by prohibiting commentary of any kind, pro or con or neutral as to Nissan. The problem would also be avoided if, as we urge on cross-appeal, the site itself were transferred to Nissan. Your time has expired, Counsel.  Thank you, Your Honor. We ask a lot of questions, so we'll give you a short time to respond. I will be brief. With respect to the overall commercial impression of the mark, I believe Judge Reimer has it right. What Nissan Motor Company is doing here is they're, in essence, trying to apply a trademark concept where you have lots of users in a particular field and trying to give a Nissan computer, a Nissan chemical, from a trademark standpoint, but that just doesn't work in the dilution area, because in dilution it is reserved for a select class of marks. With respect to the such-use argument that Nissan Motor has made here, I would point out that that argument is an argument that has already been raised and addressed by a sister circuit, and that is in the Federal Circuit, in the Enterprise case. And in the Enterprise case, it was in a slightly different factual scenario, but in the Enterprise case, the Court specifically looked at that language. It said the term such-use could refer to any use by the defendant in commerce. Alternatively, the reference to such-use could refer to the particular use being challenged in the litigation. If the use being challenged were limited to a particular geographic area in which there had been no prior use by a defendant, the suit would not be barred. It was a geographic issue there. However, we think that the latter is not a tenable reading of the statute. That is, the Federal Circuit, in reviewing that specific language, felt that the such-use had to refer to any use by a defendant in commerce. With respect to the use of Nissan alone, I would point out that there are a number of uses of Nissan that are in different style, different size, as compared to computers. Sometimes you have Nissan and you have a computer going up the side. So it's not that it was always in some kind of boring, bland script, and that's the only way that it was there. With respect to the factual disputes and the timing that's here, I would point out that even as late as December of 1990, the employees at Nissan Motor Company, and this is in the record here, in the briefs, admitted that Nissan is still confused with Datsun, that Nissan has yet to establish its own identity or image. I think that is very powerful evidence which a jury should be entitled to evaluate, assuming that this Court determines that 1991 is the critical date, rather than 1980. And then with respect to the surveys, Judge Reimer asked about the survey that was, or talked about the survey that was resolved by Judge Pragerson. I would point out that, number one, the primary thrust of the issue on the survey that we had was a conflict of interest that Dr. Ford had because of a previous contact that I had with him. I would also point out that we had an expert, Dr. Ben Ennis, who made substantial criticisms of that survey. And what Judge Pragerson ruled was that the survey would be admissible, but the weight of that survey certainly is something for the jury to take a look at. And I would point out, even in the recent case of the Playboy Enterprises versus Netscape, when you have a survey that is criticized by an expert here, that that is a jury question. Finally, it hasn't been addressed, but the Mosley decision, it is in the briefs. I believe that, if for no other reason, certainly the issue of actual harm needs to be addressed. And in the actual harm context, the Pelleys here are both Nissan Motor Company and Nissan North America. It's been undisputed in the papers here that Nissan North America is not a proper party to a dilution claim. The actual harm would have to be directed to Nissan Motor Company, and Nissan North America should not continue, even if this case is remanded. Thank you, Counsel. Thank you. The case just argued is order submitted. We'll take a 10-minute recess before hearing the final case. All rise. This court will stand on recess for five minutes and 10 minutes.
judges: Trott, Rymer, Thomas